**UNITED STATES DISTRICT COURT**
**THE NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| JACK TIPOLD, MARGARET SHRAGAL, GENELL CREAL and WILEY CREAL, TERESA BARON, ALFRED and LATASHA ALLEN, MALAYA GULLY, MICHAEL ZIMMER, WILLIAM ZABANEH, CAROL NORRIS and KIM NORRIS, LAWRENCE SHARON, DUSTIN BROWN and JENNIFER BROWN and JOSHUA BROWN, and CHARLES BRAY, individually and on behalf of all others similarly situated, | ) | Case No. 2:26-cv-00459-PPS-JEM |
| Plaintiffs, | ) | CASE BELOW:<br>Porter Superior Court 1<br>Porter County, Indiana<br>Cause No. 64D01-2608-CT-009189 |
| v. | ) | |
| NORTHERN INDIANA PUBLIC SERVICE COMPANY, LLC, | ) | |
| Defendant. | ) | |

**<u>PLAINTIFFS' RESPONSE TO NIPSCO'S MOTION TO DISMISS OR STAY</u>**

Plaintiff, JACK TIPOLD ("Jack"), individually and on behalf of all others similarly situated, including MARGARET SHRAGAL, GENELL CREAL and WILEY CREAL, TERESA BARON, ALFRED and LATASHA ALLEN, MALAYA GULLY, MICHAEL ZIMMER, WILLIAM ZABANEH, CAROL NORRIS and KIM NORRIS, LAWRENCE SHARON, DUSTIN BROWN and JENNIFER BROWN and JOSHUA BROWN, and CHARLES BRAY ("Co-Plaintiffs") (collectively, "Plaintiffs"), by counsel, ALLEN LAW

GROUP, LLC, hereby respond to Defendant, Northern Indiana Public Service Company, LLC's Motion to Dismiss or Stay [DE 10], and respectfully state as follows:

**ARGUMENT**

As set forth below, NIPSCO's Motion must be denied for several reasons. First, it is a substantive motion on the merits of this case whereas Plaintiffs' pending Motion for Leave to Amend and Motion to Remand challenge the Court's ability to hear this case at all. Those threshold issues should be resolved first.

Even assuming jurisdiction is appropriate with the Court, NIPSCO's Motion must be denied. Throughout its argument, NIPSCO follows the same theme. It repeatedly attempts to reframe this case into something it is not as a way to then generate an outcome in its favor. Without this reframing, none of NIPSCO's arguments hold up.

The primary jurisdiction doctrine does not apply because this case does not require the specialized expertise of any administrative agency. NIPSCO's direct intervention, through its negligent failure to conduct vegetation management, precludes its reliance on an "act of God" defense. Indiana's economic loss doctrine does not apply because the losses suffered by Plaintiffs are not "purely" economic losses. Nor is a stay warranted: the IURC cannot award Plaintiffs damages, and its pending proceeding concerns NIPSCO's post-storm restoration practices, not its vegetation management. And—despite being initially filed in Indiana state court, with its notice-pleading requirement—

Plaintiffs' First Amended Complaint adequately pleads their claims under Federal pleading requirements.

**1. Because Remand is Appropriate, the Court May Not Address the Merits of NIPSCO's Motion.**

On October 2, 2026, Plaintiffs filed a Motion for Leave to Amend their First Amended Complaint. [DE 9.] The proposed amendment would redefine the proposed class in this matter, as well as the related exclusions from future class members, and eliminate the federal jurisdictional anchors asserted by NIPSCO to justify removal of this case from state court. As "master[s] of the complaint," Plaintiffs have control over the claims they bring and parties they bring them against, allowing them to "establish—or not—the basis for a federal court's subject-matter jurisdiction." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025); *see also Zurbriggen v. Twin Hill Acquisition, Inc.*, 178 F.4th 1081, 1087 (7th Cir. 2026) (noting reasoning of *Royal Canin* applies to federal class action jurisdiction).

Additionally, on October 5, 2026, Plaintiffs filed a Motion to Remand, showing that remand was required for several reasons (in addition to their Proposed Second Amended Complaint vitiating any federal jurisdictional basis for this matter). [DE 14.] First, NIPSCO failed to adequately prove removal was appropriate under the Class Action Fairness Act ("CAFA"). Second, even if NIPSCO carried its burden of showing removal was appropriate, CAFA contains two express statutory exceptions that both apply in this case and require the Court to decline jurisdiction. Third, NIPSCO overstated the scope of

Federal Enclave Jurisdiction in its removal. Indeed, Federal Enclave Jurisdiction requires "most, if not all" of the operative events to have occurred on a federal enclave. Here, however, only a hypothetical (and de minimis at most) quantity of injuries or harm could have occurred in federal enclaves.

Because remand is necessary, the Court cannot decide the merits of NIPSCO's Motion to Dismiss or Stay. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). "[A] federal court may not hypothesize subject-matter jurisdiction for the purpose of deciding the merits." *Ruhrgas Ag v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999). "The requirement that jurisdiction be established as a threshold matter . . . is 'inflexible and without exception.'" *Id.* (citing *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 94–95 (1998)). Thus, outside of "a few extraordinary cases"—none of which apply here—determinations of jurisdiction "must precede merits in dispositional order." *Id.*

In short, this case is a state-centric matter, with state-centric parties, and state-centric injuries. There is no basis for it to be in federal court. The Court must therefore remand it and allow the merits of this dispute to appropriately be decided in state court.

At a minimum, the Court should hold NIPSCO's Motion in abeyance until it has ruled on Plaintiffs' Motion to Remand and Motion for Leave to Amend.

**2. The Primary Jurisdiction Doctrine Does Not Apply.**

NIPSCO asserts the primary jurisdiction doctrine as a basis to dismiss Plaintiffs' claim. The doctrine "is an invention of the United States Supreme Court to deal with the problem that arises when the courts and an agency have claims to jurisdiction of an issue in a case that has come before a court." *Austin Lakes Joint Venture v. Avon Utils.*, 648 N.E.2d 641, 645 (Ind. 1995) (citing *Texas & Pac. Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907)). Despite its name, however, in Indiana the doctrine is not seen as jurisdictional, but prudential. *Id.*

As a mechanism of judicial prudence, the doctrine acts to limit a court's authority over certain cases where an administrative agency's technical expertise is required. *Duke Energy Ind., LLC v. City of Noblesville*, 234 N.E.3d 173, 180 (Ind. 2024). It applies "when agencies and courts share jurisdiction over **actions**, but the legislature has reserved certain **issues** or **claims** for an agency." *Id.* In contrast to NIPSCO's implication that the doctrine requires every matter to be referred to an administrative agency, it only "requires a trial court to avoid answering **technical questions** that the legislature gave an agency the power to decide." *Id.* (emphasis added). In other words, it only restricts a court's authority when a legal issue—otherwise cognizable in a trial court—"**requires** a determination within an agency's expertise." *Duke Energy*, 234 N.E.3d at 180 (emphasis added).

Indiana's approach to applying the primary jurisdiction doctrine mirrors the flexible approach taken by federal courts. *Austin Lakes*, 648 N.E.2d at 646. "First . . . the

court should examine each issue presented by the case. If at least one of the issues involved in the case is within the jurisdiction of the trial court, the entire case falls within its jurisdiction." *Id*. This is the outcome "even if one or more of the issues are clearly matters for exclusive administrative or regulatory determination." *Id.*

Second, once the court determines it has subject matter jurisdiction over the case, "it must review the issues in the case claimed to be matters within the purview of an administrative or regulatory agency to determine whether the doctrine of primary jurisdiction should be invoked." *Id.* This means determining "whether the court, while retaining jurisdiction over the case, should refer an issue or some subset of issues in the case to the expert agency for its opinion or final decision." *Id.*

"[W]here an issue in the case is one that can be decided by either the trial court or by the administrative agency . . . the decision whether to invoke the doctrine of primary jurisdiction is within the discretion of the trial court." *Id.* at 647. Its discretion should be guided by "(i) what sort of facts will arise and whether the factfinding involved will be within the special competence and expertise of an administrative body, and (ii) to what degree uniformity in the regulatory scheme is desirable and to what degree a court decision might affect the uniformity of a regulatory scheme." *Id.*

The doctrine is most applicable "where an agency has already exercised its authority to decide an issue and one customer of a regulated industry is suing another." *Id.* But "many of the cases hold that the doctrine of primary jurisdiction should not be

invoked when the issue is whether an agency standard has been violated (as opposed to whether an agency standard is reasonable).” *Id.* at 648.

This distinction is critical, and NIPSCO sails right past it. NIPSCO’s motion paints a picture of Plaintiffs challenging the reasonableness of its vegetation management program, authorized by the IURC as part of NIPSCO’s regular rate-making procedures and regulatory obligations. NIPSCO seeks to create the impression that Plaintiffs are attempting a collateral attack on the IURC’s decision-making; that Plaintiffs are second-guessing both the IURC and the Indiana General Assembly by saying NIPSCO’s vegetation management program is deficient or that the IURC’s standard is unreasonable.

NIPSCO presents a well-constructed straw man argument. Plaintiffs are doing none of the things NIPSCO asserts.

- Plaintiffs do not contest that the Indiana General Assembly has vested the IURC with authority over regulation of public utilities.
- Plaintiffs are not arguing that the Court should violate the principles of separation of powers and override the Indiana General Assembly’s authority.
- Plaintiffs are not attempting to substitute their judgment for the IURC’s technical expertise as to what a reasonable vegetation management program needs to be for any given utility.

To the precise contrary, Plaintiffs agree that the IURC, though a delegation by the General Assembly, has authority to regulate NIPSCO’s vegetation management. Plaintiffs are not asserting that any IURC standard is unreasonable. Rather, their negligence action contends that NIPSCO has failed, and continues to fail, to exercise reasonable care in

managing vegetation around its lines—a standard measured by the program NIPSCO represented to the IURC that it would follow, by NIPSCO's own line-clearance manuals, and by the custom and practice of the utility industry, including NESC and ANSI standards [DE 5 at ¶¶ 20, 22(b)–(d), (f), (j), (p), (r)]. Among other things, Plaintiffs will show that NIPSCO:

1) told the IURC it would follow one form of vegetation management program and then either did not do it at all and/or used another, cheaper program altogether; and/or

2) told the IURC it would follow one form of vegetation management program and failed to follow its own program obligations; and/or

3) failed to identify and remove hazard trees, to keep vegetation a safe distance from its lines, and to inspect its lines and poles as industry custom and practice require. [DE 5 at ¶¶ 22(e)–(g), (o). .

These are not claims invoking IURC's jurisdiction or technical expertise. These are claims that a publicly regulated utility negligently and/or recklessly failed to meet the standard of care—including standards it committed to its own regulator to follow. These are claims in which the issue is whether an agency standard has been violated, not whether that standard was reasonable. Such claims underpin countless cases without triggering the primary jurisdiction doctrine. *See, e.g.*, *Austin Lakes*, 648 N.E.2d at 648 (listing cases).

NIPSCO either exercised reasonable care in managing vegetation around its lines—as its own programs, its manuals, and industry standards required—or it did not. This determination will require no specific expertise or unique competence from the

IURC. The facts that will arise will be no more complex than asking a highway department if it paved a given road as directed. Further, there is no risk of disrupting IURC's regulatory scheme through this litigation because the regulatory scheme is not the issue. The issue can be characterized as follows: "You told the IURC you would do X. The standard of care required X. You negligently or recklessly either didn't do X and/or did Y." That issue and the related claims are squarely within the purview of a court to adjudicate and a jury to hear and decide as the trier of fact. The Court should exercise its discretion and retain this case.

NIPSCO cites *NIPSCO v. Dozier* for its view that "Indiana law leaves no doubt about where the primary jurisdiction over utility service resides." [DE 11, p. 14]; 674 N.E.2d 977 (Ind. Ct. App. 1996). *Dozier*, however, is inapposite to the facts of this case. *Dozier* involved NIPSCO's denial of gas service to a single consumer because of an outstanding bill. *Id.* at 983. And "[t]he issue before the trial court was whether NIPSCO improperly with hold gas service to Dozier pursuant to the applicable Indiana statute and administrative code." *Id.* It was not a case of NIPSCO's negligence; it was not a case where the plaintiff sought compensatory damages for that negligent misconduct. The denial of Dozier's service was squarely within the administrative scheme and "a matter for exclusive IURC jurisdiction." *Id.* Nevertheless, the Court of Appeals concluded "the trial court had subject matter jurisdiction over the entire case" because Dozier sought a preliminary injunction. *Id.* at 988–89.

Moreover, just because IURC is empowered to hear complaints (which the Office of Utility Consumer Counselor may also initiate) related to public utilities or has, subsequent to the filing of this lawsuit, initiated its own investigation into NIPSCO's response to the August 11, 2026, power outage, does not determine whether the primary jurisdiction doctrine should deprive the Court—or any court—of the ability to hear these claims. By NIPSCO's own description, that proceeding concerns "NIPSCO's practices and procedures **restoring** power outages after the August 2026 storm"—not NIPSCO's vegetation management over the preceding two years. [DE 11 at p. 11 (emphasis added).]Most significantly, the IURC has no power to award Plaintiffs compensatory damages for NIPSCO's negligence. *State ex rel. Indpls. Water co. v. Niblack*, 240 Ind. 32, 34–35 (1959) (rejecting application of primary jurisdiction doctrine, in part, because the utility regulatory commission"has no judicial power to render a money judgment, as is sought by plaintiff in respondent court").

When, as here, the claims do not involve technical expertise and the remedy is beyond the scope of the regulatory body, it is permissible for a court to hear the claims even if an administrative process might likewise be partly available. *Cf. Duke Energy*, 234 N.E.3d at 181 (claims to enforce ordinances against public utility were equally able to be heard by IURC or trial court and primary jurisdiction doctrine allowed trial court to decide claims); IURC Order, Cause No. 43663 (Nov. 30, 2010) at p. 103, *available at* in.gov/iurc/tree-trimming (rejecting creation of additional dispute resolution process

because, in addition to OUCC and IURC processes, aggrieved parties "may also avail themselves of whatever right to recourse may be available to them under Indiana law.").

The primary jurisdiction doctrine does not counsel, much less compel, the Court to divest itself of any portion of this case. NIPSCO's motion must therefore be denied.

**3. The Acts at Issue Were NIPSCO's, not God's.**

NIPSCO also seeks to avoid accountability by claiming that its IURC-approved tariffs, which limit NIPSCO's liability for "any act, omission or event caused by strikes, acts of God, or unavoidable accidents or contingencies beyond its control," require dismissal of this case. It argues that because at least some of the power outages in the two-year span of Plaintiffs' First Amended Complaint followed weather events, NIPSCO's tariffs necessarily operate to bar all of Plaintiffs' claims. Again, NIPSCO seeks to make this case about something other than its own misconduct.

For starters, NIPSCO's narrative depends on facts outside of the Complaint and paints as true a conclusion to the very legal question at issue in this case. While the Court can take judicial notice that the Natl Weather Service reported a derecho and storms in August 2026, it may not notice the contested inference NIPSCO asks it to draw from those reports: that the weather alone, to the exclusion of NIPSCO, caused every outage at issue. Judicial notice may be taken of facts "not subject to reasonable dispute" but **not** the truth of disputed conclusions drawn from public records. Fed. R. Evid. 201(b); *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1083 (7th Cir. 1997) (Disputed facts must be

subjected to rebuttal evidence, cross-examination, and argument. "If a court takes judicial notice of a fact whose application is in dispute, the court removes these weapons from the parties and raises doubts as to whether the parties received a fair hearing.")

NIPSCO's own testimony in the November 2010 order, laid out below, shows the disputed nature of this conclusion. NIPSCO itself told the IURC that its clearance specifications account for, among other things, "swing & sway of trees during high winds." IURC Order, Nov. 30, 2010, p. 13. Its vegetation management program was designed to prevent or mitigate "acts of God." Whether it properly performed that vegetation management is the key allegation at issue. NIPSCO's argument tells the Court to assume it did and therefore its tariffs should bar its liability. This is putting the cart before a million horses.

Additionally, NIPSCO's position implies that every member of the class is a NIPSCO customer. That is the extent to which the tariffs apply, by NIPSCO's own admission. [DE 11, p. 12 ("The Commission-approved tariff carries the force of law and binds **every customer** within NIPSCO's territory.") (emphasis added).] Nothing in the proposed definition of Plaintiffs' class—or potential subclasses—limits this class action to NIPSCO customers. It may include members who are Indiana citizens harmed by NIPSCO's misconduct because of outages even though they are not themselves NIPSCO customers. NIPSCO cannot terminate an entire litigation based on such a presumptive narrowing of the putative class.

Even if the tariffs were properly applied at the start of a case rather than at the end, and applied to all class members, they do not support excusing NIPSCO from liability. NIPSCO's position is that its tariff's limitation on liability exists "because no level of investment can eliminate weather-related disruptions." [DE 11 at p. 19]. This is a false equivalence.

The complete elimination of power outages triggered by weather events and NIPSCO's obligation to act reasonably to prevent and mitigate them by adhering to its IURC-approved vegetation management program are not the same thing. The express purpose of a vegetation management program is to prevent or mitigate the disruption of service, including those caused by weather events. The IURC's November 30, 2010, Order makes this abundantly clear. *See* IURC Order, Nov. 30, 2010. And NIPSCO's own testimony contained in that Order undercuts its reductive argument and shows that it knew exactly why it was supposed to perform appropriate vegetation management, and what might happen if it failed to do so.

NIPSCO testified in the hearings leading to promulgation of the Order that "the provision of safe, reliable and efficient service includes preventive measures against outages and **one of the best preventative measures is to actively manage vegetation in a reasonable manner** so as to avoid such outages." *Id.* at 4 (emphasis added). NIPSCO further testified that its annual distribution circuit trim schedule clearance specifications—how far back vegetation must be trimmed from power lines—"take into

account future growth rates, **wind displacement of conductors, swing & sway of trees during high winds,** maximum sag of conductors, electrical clearance requirements (i.e., flashover distances) and other factors." *Id.* at 13 (emphasis added). And with respect to weather events (using ice storms as an example), NIPSCO testified that, "while it is impossible to completely prevent damage caused by ice storms, **proper utility vegetation management practices certainly can mitigate the effects** by reducing exposure to tree-related outages resulting from ice storms." *Id.* at p. 60 (emphasis added).

On the merits, Plaintiffs' claims make clear that these outages were not "acts of God" under Indiana law. NIPSCO cites *Quality Custom Distribution Servs. LLC v. Int'l Bhd. of Teamsters, Loc. 710*, 131 F.4th 597, 598 (7th Cir. 2025), to define "Act of God" as "a harmful event in the natural world, such as a flood or tornado." [DE 11 at p. 17]. *Quality Custom*, however, involved an employer-employee arbitration of a dispute triggered by the COVID-19 pandemic. "The arbitrator concluded that an 'Act of God' is a harmful event in the natural world, such as a flood or tornado, rather than an effect of statutes, regulations, and executive orders." *Quality Custom*, 131 F.4th at 598. This was **not** the Seventh Circuit defining the term; it neither adopted nor agreed with that definition—it merely held the arbitrator was empowered to interpret contractual language as part of its responsibility. *Id.* Instead, the definition of "act of God" under Indiana law is

> the manifestation of a superhuman power which breaks the chain of causation in the realm of human activity. It upsets the best-laid plans of men and spoils all their calculations. Because its coming is beyond the scope

> of a man's prevision and its power beyond his strength, he is not liable for the consequence thereof. . . .

*Spence v. Buck*, 2014 U.S. Dist. Lexis 157847 *20 (N.D. Ind. 2014) (quoting *Childs v. Rayburn*, 346 N.E.2d 655, 658 (Ind. Ct. App. 1976)).

Additionally, under long-standing Indiana law, in order to hide behind an "act of God" defense, "there must be an entire exclusion of human agency from the cause that produced the injury, and that an occurrence that is produced partially by the intervention of human agency is not an 'act of God' within the meaning of the law." *William H. Stern & Son, Inc. v. Rebeck*, 150 Ind. App. 444, 449 (1971) (quoting *Evansville, etc. R. Co. v. Scott*, 67 Ind. App. 121, 147 (1916)).

> When the effect, the cause of which is to be considered, is found to be in part the result of the participation of man, **whether it be from active intervention or neglect, or failure to act**, the whole concurrence is thereby humanized, as it were, and removed from the operation of the rules applicable to the acts of God.

*Id.* (quoting *Scott*, 67 Ind. App. at 147) (emphasis added) (failure to close off windows in building created wind tunnel effect and thus "extremely high wind" which caused part of building to fall was not act of God)); *cf. Central I. R. Co. v. Mikesell*, 139 Ind. App. 478, 481, 494 (1966) (failure to incorporate proper openings for water in railroad embankment negated act of God defense despite 20-25-year rainfall from major storm).

Here, Plaintiffs' complaints are based on the allegation that, "numerous weather events in Northwest Indiana caused vegetation, **mismanaged by NIPSCO**, to fall onto NIPSCO's utility lines, predictably and foreseeably resulting in outages." (Plaintiffs' First

Amended Complaint, ¶ 24 (emphasis added).)[1] This is precisely what NIPSCO testified could and would happen if it failed to perform vegetation management. Additionally, Plaintiffs, have set forth numerous specific allegations of NIPSCO's active intervention, neglect, or failure to act with respect to its vegetation management program, any one of which—much less all of which—would take this case out of the realm of God and leave it "in the realm of human activity." *Spence*, 2014 U.S. Dist. Lexis 157847 at *20; [DE 5 at ¶¶ 22, 22a–22r, 23, 24, 25].

It is NIPSCO's misconduct, not any act of God, that caused the power outages at issue in this case. Its vegetation management plan was crafted for the purpose of preventing and mitigating the impacts of weather-related events on its electrical service. NIPSCO's failure to comply with its IURC-approved plan therefore humanizes the whole concurrence and removes it from the operation of rules applicable to acts of God. NIPSCO's motion must therefore be denied.

**4. The Economic Loss Doctrine Does Not Bar Plaintiffs' Damages.**

NIPSCO asserts that Indiana's economic loss doctrine bars recovery for portions of Plaintiffs' claims. Specifically, NIPSCO points to Plaintiffs' claims for "perishable household good" and labels those as merely "pecuniary consequences" of its power

---

[1] NIPSCO cherry-picks this single paragraph from Plaintiffs' nine-page First Amended Complaint, incompletely quotes it to conspicuously omit the reference to its own mismanagement, and holds the remainder out as an apparent admission by Plaintiffs that these outages were acts of God. [DE 11 at p. 18].

outages and that "Indiana law bars tort recovery for such losses." [DE 11at p. 19.] NIPSCO misstates both how this doctrine operates and the nature of Plaintiffs' damages.

Under Indiana law, the economic loss doctrine provides that "a defendant is not liable in tort 'for any purely economic loss caused by its negligence.'" *Residences at Ivy Quad Unit Owners Ass'n v. Ivy Quad Dev.*, 179 N.E.3d 977, 982–83 (Ind. 2022) (quoting *Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 729 (Ind. 2010)). "At the 12(B)(6) stage, however, application of this general rule invites heightened scrutiny." *Id.* at 983. "Put simply, the economic loss doctrine's preclusive effect must yield if the plaintiff has set forth any set of circumstances under which it would be entitled to relief." *Id.* This is "a relatively low bar." *Id.*

The doctrine bars "purely" economic loss, which is "financial harm 'arising from the failure of [a] product or service to perform as expected.'" *Id.* (quoting *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 153 (Ind. 2005)). It is "pecuniary harm not resulting from an injury to the plaintiff's person or property." *Marion Cnty. Pub. Libr.*, 929 N.E.2d at 730. In the context of the delivery of a product or services, like electricity, its scope has been defined as:

> the loss of profits because the product is inferior in quality and does not work for the general purposes for which it was manufactured and sold, and includes such incidental and consequential losses as lost profits, rental expense and lost time.

*Bamberger & Feibleman v. Indianapolis Power & Light Co.*, 665 N.E.2d 933, 938 (Ind. Ct. App. 1996) (quoting *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1089 (Ind. 1993)).

But "a defendant is liable under a tort theory for a plaintiff's losses if a defective product or service causes personal injury or damage to property other than the product or service itself." *Marion Cnty. Pub. Libr.*, 929 N.E.2d at 729. "Pure economic loss excludes damages that either stem from personal injury or are sustained by 'other property.'" *Ivy Quad*, 179 N.E.3d at 983 (quoting *Gunkel*, 822 N.E.2d at 153–54). *See also Binns v. Ocwen Loan Servicing, LLC*, 2015 U.S. Dist. LEXIS 134620 *9–10 (S.D. Ind. Apr. 1, 2015) ("Thus, any sort of property damage or personal injury distinct from economic loss precludes application of the rule.")

"[P]roperty acquired separately from the defective good or service is 'other property,' whether or not it is, or is intended to be, incorporated into the same physical object." *Gunkel*, 822 N.E.2d at 155. "When such damages occur, recovery in tort is appropriate, and the economic loss doctrine does not bar recovery." *Ivy Quad*, 179 N.E.3d at 983. Here, damage to "other property" is exactly what Plaintiffs have alleged.

*Bamberger*—the case NIPSCO points to as guiding this issue—illustrates this very distinction and sits on facts squarely distinct from those presented here. In *Bamberger*, an electrical utility company had an equipment failure that resulted in a two-day power outage. *Bamberger*, 665 N.E.2d at 935–36. As a result, two lawyers could not work from their law office. *Id.* at 936. They sued the utility for negligence and strict liability (under the Indiana Product Liability Act), claiming lost billable time for them and their staff, lost

rental value of the offices, and lost access to their parking garage. *Id.* Notably, [t]he law firms [did] not allege actual physical harm to persons or property." *Id.* at 938.

The trial court judge granted summary judgment to the utility on both claims on the basis of the economic loss doctrine. *Id.* at 935. The Court of Appeals affirmed. *Id.* With respect to the lawyers' negligence claim, the Indiana Court of Appeals noted the reluctance "to extend the economic loss rule to all actions for negligence." *Id.* at 938. "Negligence theory protects interests related to safety or freedom from physical harm. This includes not only personal injury but damage caused by defective personal property." *Id*. The lawyers had alleged only intangible, financial losses—"harm to their property interest in the practice of law"—and not "actual physical harm to persons or property." *Id.* The Court of Appeals "declined [the lawyers'] invitation to equate the loss of the opportunity to practice law with physical harm to property." *Id.* at 939.

This case is not "*Bamberger* all over again." [DE 11 at p. 20.] Here, unlike the lawyers in *Bamberger*, Plaintiffs have alleged actual, tangible physical damage to "other property" stemming from NIPSCO's negligent breach of its duty to perform vegetation management. That the damaged property might be, for example, personal property in the form of household goods that spoiled, rotted, and had to be thrown away does not change that fact or mean that that compensation through a negligence claim is inappropriate. This was property acquired by Plaintiffs separately from the service they

procured from NIPSCO. Just because it cost Plaintiffs money to make themselves whole after NIPSCO's misconduct does not render their loss "purely economic."

NIPSCO's position would reclassify every non-personal injury justifying compensation into a "purely" economic loss. Such a principle would subsume virtually every tort and turn the idea of compensatory damages on its head. For example, in a standard car accident case, NIPSCO's extreme version of the economic loss doctrine would bar seeking compensation for damage to the car; compensation for medical bills paid to a doctor following the crash; compensation for damaged personal property destroyed in the vehicle as a result of the crash. This is not what the economic loss doctrine does. *See Miller v. U.S. Steel Corp.*, 902 F.2d 573, 574 (7th Cir. 1990) (economic loss doctrine better framed as "commercial loss" doctrine, because "personal injuries and especially property losses are economic losses, too—they destroy values which can be and are monetized").

NIPSCO's own authority underscores the point. As NIPSCO acknowledges, the doctrine addresses "disputes involving only economic losses between parties in privity of contract." [DE 11 at p. 20 (quoting *Lake Ridge New Tech Schs. v. Bank of N.Y. Mellon, Tr. Co., N.A.*, 353 F. Supp. 3d 745, 759 (N.D. Ind. 2018))]. The proposed class is not limited to parties in privity with NIPSCO. And NIPSCO's effort to recast this case as a dispute over "the service the tariff contemplates" (*id.*) ignores that Plaintiffs' claims rest on NIPSCO's

independent duty to exercise reasonable care in maintaining its lines—a duty that exists regardless of any contract.

Plaintiffs suffered personal injury and injury to "other property." Compensation for these harms appropriately sounds in tort, and the economic loss doctrine does not bar recovery for Plaintiffs' losses. NIPSCO's motion must therefore be denied.

**5. Plaintiffs' Personal Injury Claims Are Sufficiently Pled.**

Finally, NIPSCO argues that Plaintiffs' First Amended Complaint, filed in state court under Indiana's notice pleading standard, now fails to adequately allege the duty, breach, and proximate cause elements of negligence under the Federal standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Under this standard, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Levy v. W. Coast Life Ins. Co.*, 44 F.4th 621, 627 (7th Cir. 2022). A reviewing court "constru[es] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts and drawing reasonable inferences in the plaintiff's favor." *Id.* at 626.

Once again, NIPSCO attempts to re-cast Plaintiffs' claims into something they are not. Plaintiffs have adequately pleaded the elements of NIPSCO's negligence: its statutory duty, its numerous breaches of that duty, and that the breach is the proximate cause of the Plaintiffs' injuries.

Throughout its argument, NIPSCO relies heavily on *Pope v. Hancock Cnty. Rural Elec. Mbrshp. Corp.*, 937 N.E.2d 1242 (Ind. Ct. App. 2010). *Pope* sits on completely different procedural, temporal, and evidentiary grounds. The gulf created between its posture and that of this case renders *Pope* completely inapposite. NIPSCO misstates this opinion, what it says, and what it stands for.

In *Pope*, an electric utility customer was injured in his home after tripping over a wheelchair in the dark. *Id.* at 1245. His home was dark because a storm had knocked out power to his house and the electric utility had not yet restored service. *Id.* The customer sued, alleging the customer was injured because of the failure to restore power. *Id.* The matter proceeded to trial, and at the end of the customer's case in chief, the utility moved for a directed verdict. *Id.* The trial court granted the utility's motion and entered judgment in its favor. *Id.* The Indiana Court of Appeals affirmed. *Id* at 1248.

*Pope* has **nothing** to say about the pleading standards related to the customer's complaint. The Indiana Court of Appeals did **not** "affirm[] dismissal because plaintiffs could not establish a duty against an electric utility for personal injuries from a power outage." [DE 11 at p. 21]. The Indiana Court of Appeals did **not** find that "Indiana law does not impose a legal duty on a utility to safeguard each customer's health during an outage." [DE 11 at p. 21 (citing *Pope*, 937 N.E.2d at 1244–45, 1247)]. *Pope* does **not** set forth the contours of a utility's breach of its duty to provide electrical service. *Pope* does **not** say

that imposing a duty on a utility under these circumstances "would create limitless liability for any utility." [DE 11 at p. 22 (citing *Pope*, 937 N.E.2d at 1246)].

*Pope* was entirely about the evidence the customer presented at trial, and whether it was "evidence of probative value supporting each element which would justify submission of the claim to the jury." *Pope*, 937 N.E.2d at 1246 (quoting *S.E. Johnson Cos. v. Jack*, 752 N.E.2d 72, 78 (Ind. Ct. App. 2001)). The Indiana Court of Appeals, in affirming the trial court's entry of judgment for the utility, found the customer "produced no evidence to establish a standard of care" by which the utility should have restored service or the standard of care related to service restoration, *id.* at 1247, nor did the customer present evidence that the utility "deviated from a requisite standard of conduct in the maintenance of its electrical lines" or what that standard should be, *id.*, and that the customer wholly failed to present any evidence that the utility's conduct was the proximate cause of the customer's injury, *id.* at 1248.

In other words, *Pope* is entirely about the evidence a utility customer presented **at trial** and whether that evidence was sufficient, at the very conclusion of the proceeding, to justify the jury deciding the case. It is not a case that outlines the legal standard for how these cases must be pleaded at their very outset, much less how they should be pleaded in Federal court. NIPSCO's attempt to characterize *Pope* as a guidepost for this case is fundamentally incorrect. *Pope* does not apply.

**Duty.** NIPSCO first argues that Plaintiffs have not alleged facts sufficient to prove NIPSCO has "a duty not merely to deliver electricity, but to provide them personal healthcare while losing power during storms." [DE 11 at p. 21]. This is a dramatically specific narrowing of NIPSCO's alleged duty unsupported by any pleading in this case. Plaintiffs' First Amended Complaint does not contain facts related to this duty because that is not the duty at issue.

Plaintiffs' First Amended Complaint alleges that "NIPSCO was obligated to perform vegetation management in accordance with custom and practice in the utility industry and consistent with its representations to the IURC and pursuant to standards and orders promulgated by the IURC." [DE 5 at ¶ 20]. NIPSCO **concedes** this duty. "Under [IURC regulations], investor-owned electric utilities like NIPSCO must develop and maintain vegetation management programs under recognized technical standards." [DE 11 at p. 10]. NIPSCO admits it is subject to a "statutory requirement to 'furnish reasonably adequate service.'" [DE 11 at page 14 (citing Ind. Code § 8-1-2-4)]. And NIPSCO admits that vegetation management is encompassed in that duty—"'is an essential component of each utility's provision of reasonably adequate service and facilities.'" [DE 11 at p. 14 (quoting IURC Order, Nov. 30, 2010, at 95)].

Plaintiffs' personal injury claims rest on NIPSCO's failure to carry out its conceded duty—not NIPSCO's attempted reformulation of Plaintiffs' allegations. There is no question that Plaintiffs sufficiently alleged the existence of a duty on the part of NIPSCO.

**Breach.** NIPSCO continues its retelling of Plaintiffs' claims by arguing that "[n]ot one of Plaintiffs' breach allegations addresses a standard of care for personal injuries" and "[n]one of Plaintiffs' alleged breaches involves personal injuries from power outages." [DE 11 at p. 22]. Again, there is a reason for this.

The duty NIPSCO breached was its admitted duty to perform vegetation management. The standard of care for this obligation, as it is with any duty, is "the duty to exercise reasonable care under the circumstances." *Carter v. Indpls. Power & Light Co.*, 837 N.E.2d 509, 515 (Ind. Ct. App. 2005), *trans. denied*; *see also Pilkington v. Hendricks Cnty. Rural Elec. Membership Corp.*, 460 N.E.2d 1000, 1005 (Ind. Ct. App. 1984) ("In Indiana, the standard of care required of companies transmitting electricity is the care a person of reasonable prudence would ordinarily use under like conditions or circumstances."). Plaintiffs' First Amended Complaint is rich with extensive factual allegations about the manner and means in which NIPSCO committed this breach [DE 10 at ¶¶ 22a–r]. Plaintiffs' First Amended Complaint easily satisfies the pleading standard set forth in *Twombly*.

**Proximate Cause.** Plaintiffs' First Amended Complaint alleges that Jack, on August 11, 2026, was in an oral surgery when the power went out, forcing the termination of his procedure and subsequent discharge without adequate pain control. [DE 5 at ¶ 26]. He consequently suffered unnecessary and protracted physical and emotional pain because of the delay in his post-operative care. It further alleges that the power outage on August

11, 2026, was a direct, predictable, and foreseeable result of NIPSCO's pattern of vegetation mismanagement. [DE 5 at ¶¶ 25, 22a–22r, 24]. This is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

NIPSCO's argues that Plaintiffs' First Amended Complaint "does not allege that the facility lacked backup generators, that the provider had no clinical alternatives or adequate pain medication, or that Plaintiff Tipold sought follow-up care and was turned away." [DE 11 at p. 23]. NIPSCO's approach would require a plaintiff to affirmatively plead the negation of any and all intervening and/or superseding causes or other defenses that a defendant may later assert. Nothing pre- or post-*Twombly-Iqbal* requires such an onerous hurdle be cleared for a claim to be initiated. *Cf., e.g., Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006) (discussing statute of limitations defense and noting "a complaint need not anticipate or overcome affirmative defenses . . . a federal complaint does not fail to state a claim simply because it omits facts that would defeat a statute of limitations defense"); *King v. Ind. Harbor Belt R.R.*, 2017 U.S. Dist Lexis 43263 *44 (N.D. Ind. Feb. 1, 2017) (plaintiffs have no obligation to allege facts negating affirmative defense and "a complaint may state a claim even though there is a defense to that claim").

Jack is the lead plaintiff of the proposed class in this matter. [DE 5 at ¶¶ 2, 12]. As such, he will be "part of the class and 'possess the same interest and suffer the same injury' as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–49 (2011);

[DE 5 at ¶¶ 16, 17]. Again, nothing in *Twombly-Iqbal* requires a class action complaint to specifically and individually plead the injury of every class member. To the extent NIPSCO seeks to undercut the pleadings related to its proximate cause with respect to Co-Plaintiffs' injuries, those injuries (and Co-Plaintiffs) will be subsumed within the class that Jack seeks to represent.[2]

In sum, Plaintiffs' First Amended Complaint satisfies the pleading requirements of *Twombly-Iqbal*. NIPSCO's Motion to Dismiss must be denied.

## CONCLUSION

It is inappropriate for the Court to proceed with NIPSCO's motion to dismiss before first resolving Plaintiffs' Motion for Leave to Amend their First Amended Complaint and Motion to Remand, both of which set forth grounds to return this matter to the state court. Any substantive issues must be resolved by the state court.

Nevertheless, NIPSCO's motion to dismiss fails on its merits as well. The primary jurisdiction doctrine does not apply when, as here, the claims and issues do not require the technical experience of an administrative agency. NIPSCO's "act of God" argument fails because of its own active negligence in failing to perform vegetation management. Plaintiffs' claimed pecuniary losses are not "purely economic," making the economic loss

---

[2] If the Court believes the injuries of Co-Plaintiffs who will be subsumed within the class need to be pleaded in greater individual detail, the appropriate remedy would be dismissal without prejudice so that the claims can be repleaded. *See Sharif Pharm., Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 919 (7th Cir. 2020).

doctrine inapplicable. And Plaintiffs' First Amended Complaint satisfies the pleading requirements set forth by the U.S. Supreme Court in *Twombly* and *Iqbal*.

**WHEREFORE**, Plaintiff, JACK TIPOLD, individually and on behalf of all others similarly situated, and Co-Plaintiffs, MARGARET SHRAGAL, GENELL CREAL and WILEY CREAL, TERESA BARON, ALFRED and LATASHA ALLEN, MALAYA GULLY, MICHAEL ZIMMER, WILLIAM ZABANEH, and CAROL NORRIS and KIM NORRIS, LAWRENCE SHARON, DUSTIN BROWN and JENNIFER BROWN and JOSHUA BROWN, and CHARLES BRAY, respectfully request the Court issue an order denying NIPSCO's Motion to Dismiss or Stay Plaintiffs' First Amended Complaint-Class Action Complaint and affording all other relief just and proper in the premises.

Respectfully submitted,

**ALLEN LAW GROUP, LLC**
*Attorneys for Plaintiffs*

*/s/ Jeffrey L. Lund*

Kenneth J. Allen (3857-45)
Otto J. Shragal (25792-64)
Jeffrey L. Lund (22454-49)

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2026, a true and accurate copy of the foregoing documents was electronically filed with the Clerk of the Court using the ECF system and has been served on all counsel of record by electronic means.

*/s/ Jeffrey L. Lund*
Jeffrey L. Lund (22454-49)